**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Victor M. Gonzalez, | ) | |
| *As the Special Administrator of the Estate* | ) | |
| *of Roger Gonzalez, deceased,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15 CV 00776 |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Arthur Davida, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the following reasons, the court grants the motion to dismiss filed by McHenry County and Keith Nygren [90], grants the motion to dismiss filed by Crawford Memorial Hospital [98], grants in part and denies in part the motion to dismiss filed by Wexford Health Services, Inc., Dr. Arthur Davida, and Dr. Roderick L. Matticks [101], and denies the motion to transfer venue filed by Crawford Memorial Hospital [108]. McHenry County, Keith Nygren, Crawford Memorial Hospital, and Wexford Health Services, Inc. are dismissed as defendants.

## STATEMENT - OPINION

This matter pertains to the death of Roger Gonzalez while incarcerated by the IDOC. Plaintiff Victor M. Gonzalez, as special administrator, has filed an action against several defendants in connection with the decedent Roger Gonzalez's medical treatment while incarcerated at the McHenry County Correctional Facility (the "Jail"), the IDOC, and various hospitals the decedent was transferred to during his incarceration. Plaintiff names as defendants McHenry County, Keith Nygren, former Sheriff of McHenry County in his individual capacity, Wexford Health Services, Inc., Wexford physicians Dr. Arthur Davida and Dr. Roderick L. Matticks, Crawford Memorial Hospital, and Dr. Stephen Israel.

On January 3, 2017, plaintiff filed his second amended complaint [82]. On February 1, 2017, defendants McHenry County and Sheriff Nygren filed a motion to dismiss the claims against them [90], along with a memorandum in support [91]. On February 6, 2017 defendant Crawford Hospital filed a motion to dismiss the claims against it [98] and defendants Wexford, Dr. Arthur Davida, and Dr. Roderick L. Matticks (the "Wexford defendants") filed a motion to dismiss several of the claims against them [101]. Notably, the motions to dismiss filed by Crawford Hospital and the Wexford defendants contended that plaintiff's state medical malpractice claims should be

dismissed in part because he failed to file a § 2-622 physician's affidavit as required under Illinois law.

On February 10, 2017, plaintiff filed a third amended complaint, which among other changes included a § 2-622 affidavit. *See* [110]. Magistrate Judge Iain Johnston ruled that the filing was proper and that the various defendants' motions to dismiss would stand against the third amended complaint. *See* [109]. On March 24, 2017, plaintiff filed an omnibus response to the various motions to dismiss [117]. On April 13, 2017, defendant Crawford Hospital filed its reply [119]. On April 17, 2017, replies were filed by the County defendants [120] and the Wexford defendants [121].

In addition to the motions to dismiss, on February 9, 2017, Crawford Hospital filed a motion to change venue to the Southern District of Illinois, which was not joined by any other defendants [108]. On March 24, 2017, plaintiff filed a response, which was joined by all other defendants apart from Dr. Israel, who did not join either motion. *See* [116]. On April 13, 2017, Crawford Hospital filed a reply [118].

In reviewing the parties' respective motions to dismiss, the court is required to "accept as true all factual allegations in the amended complaint and draw all permissible inferences in the plaintiff's favor." *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017) (internal quotations and alterations omitted). "A complaint will survive a motion to dismiss for failure to state a claim if it 'contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "That is, while a plaintiff need not plead detailed factual allegations to survive a motion to dismiss, she still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate." *Id.* (internal quotations and alterations omitted).

I. Factual Background:

The following facts are taken from plaintiff's third amended complaint.

A. Allegations against the County Defendants.

On October 18, 2013, decedent entered the McHenry County Jail as a pre-trial detainee. On entry to the Jail, decedent weighed approximately 400 pounds and had a variety of serious medical needs, including chronic hepatitis-C with liver failure, renal failure, leg edema, cirrhosis, congestive heart failure, and morbid obesity.

Plaintiff alleges that Sheriff Nygren "knew that the Jail could not accommodate a person" with his serious needs and that Sheriff Nygren "turned a blind eye to the fact that plaintiff's decedent would suffer serious pain and permanent injury if he remained at the jail." [110] at 4. Finally, plaintiff alleges that "the official policy of the Jail was to accept custody of all persons charged with crimes who could not post bond or otherwise secure pre-trial release without regard to the inability of the Jail to accommodate that person's serious medical needs." *Id.*

Plaintiff alleges that the decedent suffered several medical incidents as "the direct and proximate result" of the alleged policy. Specifically, on December 25, 2013, the decedent was found lying on the floor of his cell unresponsive and was evacuated to a hospital for emergency treatment, remaining there until December 27, 2013. There were similar occurrences and hospitalizations from January 29, 2014 until February 2, 2014, on March 1, 2014, on April 5, 2014, from July 19, 2014 until August 3, 2014, on August 6, 2014, from August 9, 2014 until August 11, 2014, and from August 15, 2014 until September 2, 2014. Plaintiff alleges that the decedent suffered pain and emotional distress due to these occurrences.

During the July, 2014 hospitalization, plaintiff alleges that "medical staff at the hospital concluded that plaintiff's decedent required physical therapy, but noted that physical therapy was not available at the Jail." *Id.* at 5. During the August to September hospitalization, a physician at the hospital wrote the following in the medical records:

> Basically he comes to the hospital with vastly elevated serum ammonia level, gets put on lactulose and rifaxirnin to which the morning level decreases and the patient returns to his baseline. Then he is released from the hospital, and comes back with the same type picture a few days later.
> …
> This patient is critically ill and will definitely need more than two midnights in hospital secondary to his risk of comorbidities, permanent disability and death.

*Id.* at 5-6.

While at the hospital during the August to September hospitalization, the decedent was allegedly encouraged to enter a plea of guilty while at the hospital in exchange for a short sentence to be served in the IDOC. Plaintiff concludes that McHenry County and Sheriff Nygren are responsible for damages due to the harm the decedent suffered prior to his transfer to the IDOC under 42 U.S.C. § 1983 and 42 U.S.C. § 12131 ("the ADA").

B. Allegations against the remaining defendants.

On September 2, 2014, the decedent pleaded guilty and was transferred from the hospital to the Northern Receiving Center ("NRC") of the IDOC. At the time of transfer, the decedent weighed approximately 460 pounds.

Defendant Dr. Davida was responsible for the decedent's medical treatment while at the NRC. On September 2, 2014, Dr. Davida was informed of the decedent's most recent hospitalization, and on September 5, 2014, Dr. Davida was informed of the results of a variety of abnormal blood tests from that hospitalization. Plaintiff alleges that despite this knowledge, Dr. Davida "turned a blind eye" to the decedent's serious medical needs. For example, the decedent was given no medical attention following his arrival at the NRC. The decedent had been taking a variety of medications, including lactulose to

treat his cirrhosis; he did not receive lactulose at the NRC until September 22, 2014. Plaintiff argues that this failure resulted because of medical personnel at Wexford or "in the alternative, plaintiff's decedent did not receive lactulose until September 22, 2014 as the result of a policy or widespread practice of defendant Wexford." *Id*. at 8.

On September 22, 2014, medical personnel ordered a repeat of the decedent's blood tests, the results of which became available on September 24, 2014 and revealed that decedent's medical condition had worsened. The decedent's condition deteriorated until he was sent from the NRC to the University of Illinois Hospital ("UIH") from October 22, 2014 to October 31, 2014. Physicians at UIH recommended that the decedent receive treatment for his hepatitis C, "preferably with noninterferon therapy." *Id*. at 9. Upon the decedent's return to the NRC, Dr. Davida did not follow the UIH physicians' advice, allegedly due to a Wexford policy rather than a medical judgment.

On November 3, 2014, a physician employed by Wexford (possibly Dr. Davida), ordered that the decedent receive morphine, allegedly with knowledge that this treatment was inconsistent with the decedent's medical condition and would result in his imminent death.

On the morning of November 6, 2014, the decedent was transferred from Stateville Correctional Center to the Robinson Correctional Center. Medical staff at Robinson recognized that the decedent had a variety of serious medical problems, including acute chronic heart failure, ascites (accumulation of fluid in the peritoneal cavity), stage 3 renal disease, morbid obesity, anemia, hepatitis C, chronic obstructive pulmonary disease, liver disease, and hypertension. At approximately 6:00 p.m. on November 6th, the decedent complained to the medical staff at Robinson that he felt his ammonia level was high. A nurse concluded that the decedent required immediate medical attention and notified an assistant warden and defendant Dr. Matticks. An ambulance transported the decedent to Crawford Memorial Hospital, where he arrived at 8:45 p.m.

Defendant Dr. Stephen Israel was responsible for the decedent's treatment at Crawford. Upon the decedent's arrival, his weight was measured at 489 pounds and his blood pressure was "very high" at 182/71. *See id*. at 11-12. Also at the time of his arrival, Dr. Israel ordered blood work and a urinalysis, but did not order a check of his ammonia levels. Plaintiff alleges that this failure was a departure from the standard of care for a patient, like the decedent, with liver failure, ascites, and who was less than fully responsive.

At 9:14 p.m., before Dr. Israel had evaluated the blood test results, defendant Dr. Matticks instructed Dr. Israel to return the decedent to Robinson. Shortly after this time, Dr. Israel reviewed the blood and urinalysis tests, and observed that the decedent's blood pressure had gradually decreased to 157/85. Dr. Israel complied with Dr. Matticks's instructions and ordered that the decedent be returned to Robinson. Plaintiff alleges that Dr. Israel's compliance "was motivated by a refusal to accommodate the disability of morbid obesity exhibited by plaintiff's decedent." *Id*. at 11. Plaintiff alleges that because

of the decedent's blood pressure, because he had not been stabilized, because of the results of the blood work and urinalysis, a physician meeting the standard of care would have recognized that a person in the decedent's position required medical treatment at a hospital.

After returning to Robinson, the decedent died on November 9, 2014. The medical examiner described the cause of death at "morbid obesity, left ventricular hypertrophy, severe pulmonary congestion, end stage hepatic cirrhosis, splenomegaly, blood morphine concentration 287 mg/ml." *Id*. at 12.

C. Plaintiff's 2-622 affidavit.

Plaintiff attaches a 2-622 affidavit and physician's report to the third amended complaint. The physician's report concludes that lactulose was necessary for the decedent and that "this regimen was not continued while he was incarcerated." *Id*. at 15.

The report notes that Dr. Davida or a physician supervised by Dr. Davida prescribed morphine, and that Wexford physicians, including Dr. Matticks, continued the prescription until the decedent died. The report opines that:

> This use of opiates in a patient, like Mr. Gonzalez, who had liver failure, cirrhosis, ascites and renal failure is a gross deviation from the ordinary standard of care because a cirrhotic liver cannot fully metabolize these drugs. This results in accumulation of the opiates in the patient's blood stream and can lead to medication overdose, which, as reflected in the death certificate, is what happened in this case.

*Id*.

The report also opines that "it was a gross departure from the ordinary standard of care for Dr. Israel to discharge Mr. Gonzalez from the hospital" with his history of blood pressure at Crawford. The report also notes that the decedent was placed on an excessively large amount of oxygen, which elevated his carbon dioxide level. The report opines that Dr. Israel's failure to order Ammonia levels was a breach of the standard of care. Finally, the report notes that Dr. Matticks directed Dr. Israel to return the decedent to Robinson, and opines that the decedent "was not stable for transfer and his evaluation was incomplete. It was a great departure from the ordinary standard of care to transfer Mr. Gonzalez back to the prison." *Id*. at 16.

II. Analysis.

First, the court will analyze the various defendants' motions to dismiss, after which the court will analyze Crawford Memorial Hospital's motion to transfer venue.

A. Crawford Memorial Hospital's motion to dismiss.

As an initial matter, plaintiff clarifies in his third amended complaint that his sole claim against Crawford Memorial Hospital ("CMH") is "a claim under the ADA." *See* [110]. CMH argues that plaintiff has failed to state a claim against CMH under the ADA. CMH first suggests that there may not be a private cause of action under Title II of the ADA. The court will not consider this argument because it agrees with CMH's second argument, that plaintiff has failed to state a claim under the ADA.

Title II of the ADA provides that "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Seventh Circuit has noted that:

> Our sister circuits have helpfully divided § 12132 into two clauses for purposes of analysis: no otherwise eligible individual with a disability may be (1) 'excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity' by reason of such disability; or (2) 'subjected to discrimination by' a public entity by reason of disability.

*Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013). The Seventh Circuit explained in *Brumfield* that "the statute's prohibition against discrimination is properly read to cover all types of disability discrimination in the 'outputs' of state and local government—their delivery of public services, programs, and activities to eligible recipients." *Id*. at 628. To state a claim under Title II of the ADA requires that the plaintiff show that denial of a service was discriminatory, based on the plaintiff's disability.

Here, plaintiff claims in the third amended complaint that the decedent was effectively denied continued service at CMH after Dr. Israel complied with Dr. Matticks's instructions and ordered that the decedent be returned to Robinson. Plaintiff alleges that Dr. Israel's order violated the ADA because it "was motivated by a refusal to accommodate the disability of morbid obesity exhibited by plaintiff's decedent." [110] at 11. CMH argues that the decedent was never denied services and that, even if he was, the denial did not constitute discrimination on the basis of a disability.

The court need not decide whether the decedent was denied medical services under the meaning of the ADA, because it agrees with CMH that, even taking plaintiff's non-conclusory factual allegations as true, it is not plausible that Dr. Israel discriminated against the decedent on the basis of his morbid obesity. Instead, as plaintiff tacitly acknowledges in his allegations, Dr. Israel ordered the decedent transferred to Robinson because the transfer was requested by Dr. Matticks. As the Seventh Circuit in *Brumfield* explained, the defendant's denial of services must be undertaken because of the plaintiff's disability. Here, there are no factual allegations to support a plausible inference that Dr. Israel ordered the decedent released because the decedent was

morbidly obese.  As such, the court agrees with CMH that plaintiff's ADA claim against
CMH must fail.[1]

B. The County defendants' motion to dismiss.

In his third amended complaint and omnibus response to the various motions to
dismiss, plaintiff explains that he has raised an ADA Title II claim against McHenry
County (through the current Sheriff in his official capacity), as well as 1983 deliberate
indifference against McHenry County and former Sheriff Keith Nygren (the County
defendants).  The County defendants have moved to dismiss the claims against them in
plaintiff's third amended complaint on several grounds.

With regard to plaintiff's ADA Title II claim against McHenry County pursuant
to 42 U.S.C. § 12132, the court reiterates the general analysis of Title II as articulated in
the previous section, describing plaintiff's ADA claim against Crawford Memorial
Hospital in the previous section.  *See Brumfield*, 735 F.3d at 626.  In addition, the court
notes that the Seventh Circuit has explained how Title II is to be analyzed in the context
of a claim that a defendant public entity has failed to accommodate a disabled plaintiff:

> [T]he Attorney General, at the instruction of Congress, has issued an
> implementing regulation that outlines the duty of a public entity to
> accommodate reasonably the needs of the disabled.  The Title II regulation
> reads:
>
>> A public entity shall make reasonable modifications in policies,
>> practices, or procedures when the modifications are necessary to
>> avoid discrimination on the basis of disability, unless the public
>> entity can demonstrate that making the modifications would
>> fundamentally alter the nature of the service, program, or activity.
>> 28 C.F.R. § 35.130(b)(7).
>
> . . . .
>
> First, as our cases already hold, failure to accommodate is an *independent*
> basis for liability under the ADA.  Second, the plain language of the
> regulation also makes clear that an accommodation only is required when
> necessary to avoid discrimination *on the basis of* a disability.  Third, the
> regulation states, in its plain language, that any accommodation must be a
> *reasonable* one.

---

[1] The court notes that Crawford Memorial Hospital raised two additional arguments for
dismissal, namely, plaintiff's failure to attach a 2-622 affidavit in the second amended
complaint and plaintiff's failure to name CMH or Dr. Israel as defendants until the statute
of limitations had expired.  First, plaintiff cured his initial failure to attach a 2-622 report
in his third amended complaint.  Second, because CMH has already been dismissed and
Dr. Israel did not join in CMH's motion or argument with regard to the statute of
limitations, the court will not consider that argument here.

*Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d 737, 750-51 (7th Cir. 2006).

As an initial matter, the parties discuss at some length whether plaintiff suffered from a disability of morbid obesity within the meaning of Title II. As with the ADA claim against Crawford Memorial Hospital, the court will not consider whether the decedent suffered from a disability because the court agrees with the County defendants that plaintiff has failed to allege a discriminatory action, be it directly or for failure to accommodate.

As the County defendants note, plaintiff does not allege actions that the County defendants took to deny him services because he was morbidly obese. Moreover, while plaintiff alleges several medical incidents that required the decedent to be transferred temporarily to the University of Illinois Hospital, there are no specific allegations as to how the County defendants failed to make an accommodation that was required to avoid discrimination against the decedent for his morbid obesity. Plaintiff simply concludes that the decedent "suffered pain and suffering and severe emotional distress as the direct and proximate result of the inability of the Jail to accommodate a person with the disabilities and serious medical needs of plaintiff's decedent." *See* [110] at 6. Without any allegations that would allow for an inference of plausibility that specific services were denied by the County defendants as a result of their failure to accommodate the decedent for his morbid obesity, plaintiff's complaint fails to state a claim under Title II of the ADA. As such, the court grants the County defendants' motion to dismiss plaintiff's ADA claims against them.

With regard to plaintiff's 1983 claims, plaintiff claims that the County defendants were deliberately indifferent to his medical needs because they had a policy of accepting any pre-trial detainees to the Jail, without regard to whether the Jail could accommodate the medical needs of the pre-trial detainees. Specifically, plaintiff alleges that the County defendants were aware of the decedent's morbid obesity and his various medical conditions, knew that the Jail would be unable to properly care for a detainee in the decedent's condition, but nevertheless took custody of him because of their policy to accept pre-trial detainees without regard to whether the Jail could accommodate their medical needs.

The Seventh Circuit has held that:

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners. A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is objectively, sufficiently serious. A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would perceive the need for a doctor's attention.  To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a sufficiently culpable state of mind.  The officials must know of and disregard an excessive risk to inmate health; indeed they must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw the inference.  This is not to say that a prisoner must establish that officials intended or desired the harm that transpired.   Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.  Additionally, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir 2005) (internal quotations and citations omitted).

Defendants note that plaintiff has not alleged any incident in which the County defendants refused to treat the decedent.  Plaintiff counters that this is not dispositive.  The Seventh Circuit has held that treatment itself does not foreclose a finding of deliberate indifference:

Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms.  The receipt of some medical care does not automatically defeat a claim of deliberate indifference.  Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers "blatantly inappropriate" medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering.

*Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).

Here, the crux of plaintiff's deliberate indifference claim is his allegation "that plaintiff's decedent was harmed at least eight times at the Jail because it could not care for him."  [117] at 12.  The County defendants argue that this conclusory allegation is insufficient because plaintiff has failed to allege facts allowing a plausible inference that plaintiff's repeated medical incidents requiring hospitalization were due to deliberately indifferent actions, such as "blatantly inappropriate" treatment, acts contrary to the recommendations of specialists, or delays in treatment for non-medical reasons.  The court agrees that without some specific allegations of wrongdoing, plaintiff's contention that the Jail was "unable" to care for him is insufficient to raise a plausible inference of deliberately indifferent treatment.  *See Perez*, 792 F.3d at 777.

Plaintiff argues that he has raised a plausible inference of deliberately indifferent treatment by referencing two physicians' notes during his hospitalizations at UIH.

First, plaintiff points to the fact that during the decedent's July, 2014 hospitalization, "medical staff at the hospital concluded that plaintiff's decedent required physical therapy, but noted that physical therapy was not available at the Jail." *See* [110] at 5. Second, plaintiff points to a physician's note at the end of the decedent's August, 2014 to September, 2014 hospitalization, wherein the physician stated:

> Basically [the patient] comes to the hospital with vastly elevated serum ammonia level, gets put on lactulose and rifaxirnin to which the morning level decreases and the patient returns to his baseline. Then he is released from the hospital, and comes back with the same type picture a few days later.
> …
> This patient is critically ill and will definitely need more than two midnights in hospital secondary to his risk of comorbidities, permanent disability and death.

*Id*. at 5-6.

The court agrees with the County defendants that these allegations are insufficient to raise a plausible inference that the County defendants knew they were unable to treat the decedent's medical needs at the Jail but housed him anyway.

First, there is no evidence of "blatantly inappropriate" treatment; plaintiff does not describe and the medical notes do not suggest what treatment the decedent had at the Jail in any depth, other than the fact that he was sent to UIH on a number of occasions.

Second, there is no evidence that the County defendants ignored recommendations from the physicians at UIH. Plaintiff does not allege that they informed the County defendants of the decedent's need for physical therapy or that the physician who wrote the note or anyone else informed the County defendants that the decedent should not be released from UIH or that he should be undergoing treatment at the Jail that he was not currently receiving. For example, the physician's note explains that the decedent improved after receiving lactulose and rifaxirnin, but there is no evidence that the decedent should have but was not given these treatments in the Jail. The only other reference to drug treatment suggests that the decedent had been taking prescription medications, including lactulose, prior to his arrival at NRC (which would include his time at the Jail), after which those medications stopped for a time. *See* [110] at 8.

Third, there is no evidence of any delays in treatment for non-medical reasons. Rather, the only evidence is that the decedent was promptly taken to UIH after every medical incident.

The court recognizes the plaintiff's argument that the County defendants were deliberately indifferent, not necessarily for any specific act they took while the decedent was at the Jail, but for the very fact of placing the decedent in the Jail while knowing they

could not properly care for his medical conditions at the Jail. But the court agrees with the County defendants that plaintiff's allegations are conclusory and he fails to allege facts sufficient to raise a plausible inference that housing the decedent at the Jail was deliberately indifferent in itself. There are no allegations sufficient to raise a plausible inference that the alleged medical incidents requiring hospitalization occurred because of the Jail's chronic inability to care for the decedent. There are no non-conclusory allegations that, if this was the case, the County defendants were put on notice of this fact by anyone, including the decedent's physicians at UIH. As such, plaintiff has failed to state a claim of deliberate indifference against the County defendants and the court grants their motion to dismiss with respect to the 1983 claims against them.[2]

Because all claims against them have been dismissed, McHenry County and Keith Nygren are hereby dismissed as defendants.

C. The Wexford defendants' motion to dismiss.

Initially, the Wexford defendants argued that plaintiff's claims against them should be dismissed because he failed to attach a 2-622 affidavit and his ADA claims against them failed to state a claim. Defendants acknowledge in their reply that plaintiff cured his defect with regard to the 2-622 affidavit by attaching it in his third amended complaint. Defendants also point out that plaintiff clarified that he does not raise an ADA claim against them. As such, the court will proceed to the remaining arguments: first, that plaintiff has failed to properly allege *Monell* liability against Wexford, and second, that plaintiff has improperly grouped allegations against the individual defendants such that it is impossible to determine what causes of action he has pleaded against them.

The court agrees that Wexford must be dismissed. As plaintiff acknowledges, the Seventh Circuit in *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782 (7th Cir. 2014) held that "Respondeat superior liability does not apply to private corporations under § 1983." *Id.* at 789. Plaintiff notes in his third amended complaint that Wexford is sued under a respondeat superior liability theory for its agents in order to preserve this issue for appeal. *See* [110] at 2. Plaintiff also contends summarily that "in the alternative, plaintiff's decedent did not receive lactulose until September 22, 2014 as the result of a policy or widespread practice of defendant Wexford." *Id.* at 8. At this stage, such conclusory allegations are insufficient to state a claim under a *Monell* theory of liability. As such, Wexford is dismissed as a defendant.

On the other hand, the court disagrees that plaintiff's claims against Dr. Davida and Dr. Matticks must be dismissed as improperly grouped allegations. Defendants cite *Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) for the proposition that "[v]ague

---

[2] Because the court agrees with the County defendants that plaintiff has failed to state a claim of deliberate indifference, the court need not consider their alternative arguments that plaintiff has failed to state a claim as to *Monell* liability, former Sheriff Nygren's personal liability, or his qualified immunity.

references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants." *Id*. at 778. While defendants are correct that such vague references are insufficient to survive a motion to dismiss, plaintiff's third amended complaint does not suffer from those errors.

Here, plaintiff specifies the unlawful actions Dr. Davida and Dr. Matticks are alleged to have taken. He claims both federal deliberate indifference and state medical malpractice claims against both physicians. The medical malpractice and deliberate indifference claims against each are clearly articulated in the body of the complaint. For example, when discussing Dr. Davida's actions after the decedent was transferred to the NRC, plaintiff alleges that "A physician who met the ordinary standard of care would have provided plaintiff's decedent with medical attention following his arrival at the NRC and following the receipt of the results of the blood tests recorded above." [110] at 7. "Defendant Davida did not meet this standard of care and turned a blind eye to the serious medical needs of plaintiff's decedent, thereby causing plaintiff's decedent to suffer harm." *Id*. "Defendant Davida's treatment deviated so radically from accepted professional judgment, practice, or standards that it was not medical judgment at all." *Id*.

Other claims are described with similar clarity throughout the third amended complaint. As such, it is sufficiently clear from the face of the third amended complaint which allegations are raised against the respective defendants and the Wexford defendants' motion to dismiss must be denied with regard to Dr. Davida and Dr. Matticks.

For the foregoing reasons, the Wexford defendants' motion to dismiss [101] is granted in part and denied in part. Wexford is dismissed as a defendant. The claims against Dr. Davida and Dr. Matticks will proceed.

D. Crawford Memorial Hospital's motion to transfer venue.

Finally, defendant Crawford Memorial Hospital has filed a motion to transfer venue to the Southern District of Illinois [108]. As noted, the court has granted CMH's motion to dismiss and CMH has been dismissed as a defendant. Notably, no other defendants joined CMH's motion to transfer venue. In fact, all defendants other than Dr. Israel joined plaintiff's response opposing the motion. As such, no remaining parties support the motion and the majority of remaining parties oppose it. This alone is sufficient reason to deny the motion. Moreover, one of the primary reasons CMH gave in support of its motion was the proposition that a defendant hospital should be sued in its own district, which is now moot, as CMH has been dismissed. For the foregoing reasons, CMH's motion to transfer venue [108] is denied.

For the foregoing reasons, the court grants the motion to dismiss filed by McHenry County and Keith Nygren [90], grants the motion to dismiss filed by Crawford Memorial Hospital [98], grants in part and denies in part the motion to dismiss filed by Wexford Health Services, Inc., Dr. Arthur Davida, and Dr. Roderick L. Matticks [101],

and denies the motion to transfer venue filed by Crawford Memorial Hospital [108]. McHenry County, Keith Nygren, Crawford Memorial Hospital, and Wexford Health Services, Inc. are dismissed as defendants.

Date: 9/26/2017                    ENTER:


_____
              United States District Court Judge


                              Electronic Notices. (LC)